Cheves J.
it* Tii •• f* ji í delivered the opinion ox the Court,
^ # On the 14th April, 1814, the commissioners of the roads for Christ Church Parish, on the application of Dr. A. V. Toomer,
“ Resolved, That Dr. J erven, John White, and R. v T. Morrison, be a committee to establish an 0ld road through Captain Barksdale's plantation, for the benefit of Dr. A. V. Toomer." And on the 5th August, 1816, they agreed to the following preamble and resolve : “ Whereas Dr. A. V. Toomer having complained to this Board, that Captain Thomas Barksdale, by frequently extending his fields, has turned him so far out of his way to the. public road as to render it highly inconvenient for him to visit his neighbours, or pursue his public or private business.” T herefore,
“ Resolved, That the committee formerly appointed be, and they are hereby required to examine the Acts of the Legislature, authorizing the commissioners to lay out roads, &c. and report to this Board at their next meeting.” And on the 8th October, 1816, they agreed to the following resolve:
“Resolved, That the old road, leading from Dr. Toomer's to the broad road, be re-establish- *56 e^’ an^ CalRam Barksdale be required to open and clear the same on or before the first day of January next, and that the secretary be, and he is hereby required to communicate to Captain Barksdale, the resolution of the Board.” in consequence of these resolutions, Mr.Barks-dale filed a suggestion in the Court of Sessions for Charleston District, alleging, among oilier things, that the road in question was not a road laid out by the commissioners of the public roads, but one established by his ancestors for their private convenience, and used by all other persons by the courtesy of his ancestors and himself; that it passed through his fields; that to continue it open would be greatly injurious to him, and of little benefit to the public; that there existed a nearer and better road to the great high road to Charleston, and that the closing of the road through his plantation would only increase the distance to other parts of the parish a quarter of a mile, and a little more. These facts were controverted by the commissioners of the roads, and much contradictory testimony by affidavits adduced on both sides. On the suggestion and testimony recited, Mr. Barksdale obtained a rule on the commissioners of the roads to show cause why a prohibition should not issue against them. Whereupon, in January term last, Mr. Justice GrimJcé presiding, the Circuit Court ordered “ The rule to be discharged, unless the Constitutional Court should be of opinion that *57 the proceeding by prohibition is the regular proceeding, in which case the prohibition is granted, subject to the revision of the Court, on the legality and merits- of the case»” From this order, Mr. Barksdale appealed to; the Constitutional Court; and we are now to consider,
1. Whether this Court has power to. grant a prohibition against the commissioners.
2. Whether, if it have the power, it ought to grant it, under the circumstances of the case.
1. On the first question, the counsel concerned in the case have concurred, or at least their difference of opinion was so inconsiderable, that I have been unable to discover where it lay. They concurred in opinion that the Court had power to grant the prohibition. Notwithstanding this agreement of adverse eounsel, it seems the authority of the Court has been doubted, both at the bar and on the bench. The immediate grounds* it is believed, on which doubts have been entertained, and which probably sustained the determination of the judge who presided in the Circuit Court, is, That the books- say, a prohibition is a writ issuing out of the Superior Courts, “directed to the judge and parties of an inferior Court, commanding, them to cease-from the prosecution of a suit, upon a suggestion that either the cause originally, or some collateral matter therein, does not belong to that jurisdiction, but to the cognizance of some other Court;” (3 Blackst. Com. 112.) and this is cer *58 tainly the language used almost invariably in the? books. Indeed, in one it is said, “ it is now most usually taken for a writ which lieth for one who * is impleaded in the Court Christian for a cause belonging to the temporal jurisdiction; (Jacobs' Law Dict. tit. Prohib. 5 vol. 316, who cites Cowdl;) and hence it is inferred that the writ of pro- • hibition can only be directed to a Court, or at most to a body or person exercising some judicial function. The accuracy of this opinion may however be reasonably disputed. While the principles in which the writ appears to have originated seem to prove that it may issue in other cases, precedents are not wanting to show that it has actually issued in such cases. It is said, “ the reason of prohibitions in general is, that they preserve the right of the King’s Crown and Court, and the quiet of the subject.” (5 Bacon's Abr. tit. Prohibitions, p. 647.) And one general ground of prohibitions is, that though the subject matter of suit is within the proper jurisdiction of an inferior tribunal, yet that in some collateral or incidental matter it is proceeding contrary to the common law, or some statutory provision. Thus it would seem, if we pursue these principles, that the Courts have authority by this proceeding to supervise the execution of the laws, not merely by keeping inferior tribunals within their proper jurisdiction, but also by enforcing a correct execution of the laws, as well the common as the statute law. To the generality of this rule, there will of course be exceptions pointed *59 out by the nature and object of this proceeding. If then the authority of these Courts be thus extensive, and such be the objects of this proceed- . , ,. , mg, what reason can there be to limit its operation merely to the regulation of inferior Courts ? Why should it not extend to other public functionaries, who are charged with the execution of the laws, and to corporate bodies, whose existence and whose privileges are an emanation of the sovereign authority? Accordingly we do find the writ of prohibition directed to persons whose characters and function had little or nothing of a judicial nature in them. Thus prohibitions have been a common remedy to restrain the excess or abuse of visitatorial authority in cases of eleemosynary corporations. (Woodeson, 1 vol. 472, 473, 479, 483, 484.) There is, it is true, in the duty of the visitors of these institutions, a power to determine, in some cases, on the rights of individuals, in relation to the corporation of which they are the visitors, but they do this more in the character of private trustees, than as public Judges. They are appointed by the founders, or their authority results to them as the heirs of the founders. (1 Woodeson, 474.) It is impossible to imagine a tribunal less resembling those which have been usually and properly denominated Courts, than would be the forum, if so we may be permitted to speak, of a visitor of one of these institutions. Less of the judicial character, or a more shadowy resem *60 blanCe of judicial functions, cannot be conceived to exist; yet they are usually restrained by proceedings in prohibition, when they exceed or abuse their authority.
From this example alone, and the cases which establish it are numerous, it will appear' that prohibitions are not exclusively directed to Courts, and that, if Judicial functions in those to whom they are directed be necessary at ail, as their foundation, they need not be very extensive,; or very strongly marked. But, I am of opinion, that in our habit of thinking on this subject, we have mistaken the derivative for the original. The origin of this proceeding, as we have seen from the authorities quoted, was to secure the sovereign rights, and preserve the public ■quiet: it was an emanation of the great executive authority of the King, delegated to his Courts, and particularly to the King’s Bench, (1 Blackst. Com. 481 — 482;) one of his prerogative writs, necessary to perfect the administration of-his justice, and the control of subordinate functionaries and authorities. By the writ of mandamus he commanded what ought to be done, and by the writ of prohibition he forbade what ought not to be done, in cases where the general authority was not denied, or not intended to be resumed. The writ of quo warranto, on the other hand, was designed to restrain and punish ■an original usurpation, or to seize again into the hands' of the crown the franchise, or authority, *61 in controversy, because it had been forfeited, it is not intended to say, that the writ of quo warranto may not be used to try the validity of aparticular franchise, or authority, at the instance oí an individual, where the Attorney General shall clothe the proceeding with the authority of the state: but it will, nevertheless, not be an adequate remedy for the citizen, if it were for no other reason than that he will hold it at the will of the Attorney General. Besides, as the object of a quo warranto is always the destruction of the franchise, or authority, it will not embrace a case where such a judgment ought not to be pronounced; as, for example, where there has been an actual, but an unintentional excess of a chartered privilege, the judgment would not surely be, that it should be seized; yet the individual would be entitled to relief. Again, where a by-law should be unquestionably correct in its terms and provisions, but should be erroneously applied or executed by the subordinate officers of the corporation, there could not be a judgment of forfeiture, but the individual, agrieved would be entitled to a remedy. Though the writ of quo warranto may sometimes supply a private remedy, it was designed for a public prosecution, and will not, in practice, be found to supersede the utility or necessity of the writ of prohibition. From this remark will be excepted cases under the statute 9 Ann, C. 20, where the writ of quo warranto was granted expressly, and is pecu *62 liarly proper to afford private relief; it being thus evident that the proceeding by prohibition in principle, is not confined to the restraint of x A 1 judicial tribunals, let us see whether there are not precedents to the same effect. In FitzherberCs Natura Brevium,p. 21, it is said, that tenant by fealty and certain rent shall, in the case there stated, have the writ of ne injuste vexes directed to the Lord, commanding him not to distrain for other services than of right he ought to do; and it is said that “ this writ is in itself a prohibition to the Lordand, again, that “ the process in this writ is attachment, prohibition,” &c.; and, though it be called the writ of ne injuste vexes, it probably received this name because it was sued out of the Chancery as a special writ, at a time when original writs to suit each particular case were obtained with almost as much facility as pleadings are now adapted to particular cases. The origin which Fitzherbert assigns to it proves this : he says, “ this writ is founded upon the statute of Magna Charta, c. 10, which willeth that no man be distrained to do greater service for a knight’s fee, nor for any other freehold, than is therefore due.” If a like foundation for the application of the writ of prohibition be desired, it will be found in many cases in the 2d section of the 9th article of the Constitution of this state, though it is obvious that this provision of Magna Charta did no more than give a specification to the right of the sub *63 ject, and did not confer the authority of the court to grant it, which existed before under its general powers. In Fitzherbert's Nat. Brev. p. 70, it is said, “ A person who is sued in the Court may purchase a writ, which is called indi-" rnvit; which writ is a, prohibition, &c.” This last authority is cited merely to show the special names which writs of the same nature often assumed as they happened to be adapted to particular cases. So in the writ of waste, at the common law, (Fitzherbert Nat. Brev. 126,) those who committed waste were punishable by prohibition and attachment. In the case of Jefferson vs. the Bishop of Durham, (1 Bos. & Pul. 120, 121.) Chief Justice Eyre says, “ At common law the proceeding in waste was by writ of prohibition from the Court of Chancery, which was considered as the foundation of a suit between the party suffering by the waste and the party committing it. If that writ was obeyed, the ends of justice were answered; but if that was not obeyed, and an alias and pluries produced no effect, then came the original writ of attachment out of chancery, returnable in a court of common law, which was considered as the original writ of the court. The form of the writ shows the nature of it. It was the original writ of attachment which was, and is, the foundation of all proceedings in prohibition."
Thus we see very clearly that proceedings in prohibition were applicable to other cases than *64 those in which inferior judicial tribunals were to J be restrained. But notwithstanding these authorities, Fitzherhcrt, (Nat. Brev. tit. Prohibition,) ' v y like the authorities who have followed him, “speaks of this writ only as a writ directed to inferior judicial tribunals. We must then consider the writ of prohibition, originally and pecuculiarly so called in the nomenclature of the’ chancery, as distinguished from other like writs, and from other proceedings by prohibition. In this way the authorities may bé reconciled and made intelligible; and we will be authorized to apply the writ according to the principles, and commensurately with the purposes for which it appears to have been designed. Writs of waste, and writs of ne injusle vexes, and other like writs, in which the proceedings were by prohibition? have indeed long since ceased in our practice j and these examples, as precedents in point? would be absurd and ridiculous: nor can we find a writ of prohibition issuing from the officina brevium, directed to commissioners of roads. But it is the peculiar and admirable property of the common law, that it authorizes its dispensers to frame their judgments upon the analogy of cases and principles to the new and continually varying circumstances, and to the present interests and conveniences of the country. We should lose the spirit, and enjoy nothing but the black letter of the common law, if, under the circumstances of our country, so entirely differ *65 «nt from England, at any period, we should not allow ourselves to apply its remedies and its process, with some little variation. The English courts themselves have done this on the very subject we are considering, for we should in vain seek in the ancient repositories of writs for a prohibition, in some of the cases which the practice of our own times has furnished. This-proceeding, in modern times, seems to have fallen into disuse in controversies between individuals, as in cases of waste and the like; and its use, on the other hand, has been extended to cases of public fuetionaries and corporate bodies, as we have seen by the examples quoted; and, it would seem, is applicable to all such cases where the object is not the destruction of the authority or franchise controverted. Now, to apply this reasoning and these authorities to the case before us. The commissioners of the roads are public functionaries, invested with judicial powers. They decide between citizen and citizen, in relation to the freehold and trans-, fer, without compensation, at their discretion, the property of individuals to the uses of the public. They cite parties before them, hear witnesses, give judgments, and enforce their judgments by high penalties. They seem to be much more clearly and properly objects of these proceedings than visiters of eleemosynary corporations ; and I am quite satisfied^ that the proceeding by prohibition is a proper proceeding in *66 case. 2d. The second question depends principally on the fact, whether this be an old road which was originally laid out by the com-o J j missioners of the roads. The authority under which the commissioners in this case have acted, is the 13th Section of the Act, entitled, “ An Act to alter and amend the Act. respecting the high roads and bridges, &c.” {Pub. Laws, 446.) On this question of fact, there is much contradictory testimony, on which the court would find it difficult to decide; and it is a question peculiarly proper for the decision of a Jury of the vicinage. I am, therefore, of opinion, that the plaintiff should declare in prohibition in order that the question may be submitted to a Jury. A majority of my brethren at least, as to the points decided, concur in this opinion; the judgment of the court, therefore, is, that the order of the Circuit Court be reversed, that the rule for a prohibition be made absolute, and that the plaintiff do declare in prohibition. (1 Saunders, 136. note 1.)
Bay, J.
In this case I differ from my brethren, whose opinions have just been delivered on one point, and on one point only; namely, that of sending the case to a Jury to determine whether the road which has been obstructed was an ancient highway or not. It appears to me, that the act of 1788, commonly called the road act, ,gives this power expressly to the commissioners: the 6th clause of the act declares that the com *67 roissioners, when appointed, shall form a Board of Commissioners for their respective parishes and districts; shall meet twice a year,- and shall have the power and authority, and are hereby required by law to lay out, make, and keep in repair all such high roads, private paths, bridges causeways, and water courses, as have been, or shall be established by law, or as they shall judge necessary, in their several parishes and districts. Here is a full, complete, and absolute power given to the commissioners over the roads in their respective parishes and districts. The high roads of our country are formed or created two ways: I. either by prescription or long use. 2. or by the express order of the Board for that purpose: in both cases they have equal power over them, and are bound to keep them open and in repair. Whether a road has been in use for a great number of years as an ancient highway, they are as fully competent to determine by the examination of witnesses, or otherwise by their own view, as any other body of men whatever; being men of the parish or district, and probably born in it, they are better qualified to determine upon the subject than any other body of men. At any rate, the law has vested the power in them, and I am not disposed to take it out of their hands to send it to another tribur nal. Highly as I respect the trial by jury in most cases, I think the power is in better hands. The commissioners are generally the most re *68 spectable men in the parish or district. They are chosen by the landholders of the country, who have a deep and permanent interest in it: whereas Juries are drawn promiscuously from every part of the country, and are drawn from all classes. It might so happen, that not one man of Christ Church Parish might be drawn upon the Jury. Besides, the mode of sending it to a Jury will not only create a delay of probably some years, but may be productive of expense. On the other hand, the decision of the Board of Commissioners is final arid conclusive, and attended neither with expense nor delay. For these reasons I am against sending the case to the Jury; and am of opinion, the motion for the prohibition should be dismissed.
Keating L. Simons for the motion.
Richardson, Attorney General, contra.